IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LAWRENCE MICHAELS                   :
                                    :
          Plaintiff,                :       CIVIL ACTION
                                    :
     vs.                            :       NO. 04-CV-3250
                                    :
THE EQUITABLE LIFE ASSURANCE        :
SOCIETY OF THE UNITED STATES        :
EMPLOYEES, MANAGERS, AND AGENTS     :
LONG-TERM DISABILITY PLAN           :
          and                       :
AXA FINANCIAL, INC.                 :
                                    :
          Defendants                :


**MEMORANDUM AND ORDER**


**JOYNER, J.**                              **October 15, 2007**


     This civil action is now before the Court for judgment on
the administrative record. For the reasons set forth below,
judgment is entered in favor of Defendants.


FACTUAL BACKGROUND

*Pre-Benefits History*

     On July 12, 1997, Plaintiff, Larry Michaels, sustained a
closed fracture of the midshaft left femur during a horseback
riding accident.  Plaintiff underwent surgery and to stabilize
the fracture, a femoral rod was implanted into his femur.
Shortly thereafter he began treatment for his injury with Dr.

1

Eric Katz, an orthopedic surgeon.  In October, 1997, he started physical therapy to rehabilitate the leg, which had limited mobility and restricted motion.  In September, 1998, Plaintiff began treatment for depression with Dr. Aaron Tessler, a psychiatrist.

As a result of the physical impairments caused by the injury, Plaintiff was unable to continue many of his duties as a tax attorney, particularly the travel that job required for business development and client services.  (Vol. I p. 383).  Consequently, he was terminated from that position effective on December 31, 1998.  (Vol. I p. 381).

In January, 1999, Plaintiff took a new job with Defendant The Equitable Life Assurance Society ("Equitable") as an Advanced Planning Director.  Equitable provided short-term and long-term disability insurance benefits pursuant to The Equitable Life Assurance Society of the United States Employees, Managers, and Agents Long Term Disability Plan ("the Plan").[1]  This plan is an employee welfare benefit plan within the meaning of sections 3(1) and 4 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§1002(1), 1003 (2004).  Pursuant to an administrative services contract with Equitable, Aetna U.S. Healthcare ("Aetna")

---

[1]The Plan is now known as the Long Term Disability Plan, sponsored by AXA Equitable Life Insurance Company.  The Equitable Life Assurance Society is now known as AXA Equitable Life Insurance Company; we will refer to it as "Equitable" here.

was the Plan Administrator at that time.[2]  The parties agree that
when he began employment with Equitable, Plaintiff received a
copy of the Summary Plan Description (SPD) for the Plan.

Plaintiff ceased work at Equitable in May, 1999 and on May
25, 1999, he filed a claim for, and was granted, disability
benefits.  Plaintiff also applied for Social Security Disability
(SSDI) benefits, which he was awarded based on a finding by the
Social Security Administration (SSA) that, as of May 18, 1999, he
was disabled.  Plaintiff had already been receiving disability
insurance benefits from his private insurer, UNUM, since April
11, 1998.  By letter dated August 3, 1999, Equitable terminated
Plaintiff's employment contract (Vol. I p. 395), and he has not
worked again since that time.

*Grant of Benefits Award and Initial Period of Disability*

Aetna approved Plaintiff for short-term disability (STD)
benefits beginning in May, 1999.[3]  To help make determinations
about the claimant's ongoing disability and inability to work,

---

[2]The contract, which became effective January 1, 1995, also
marked the adoption of a Managed Disability Benefit Plan.  Aetna
acted as Plan Administrator until December 31, 2003.  MetLife
became Plan Administrator on January 1, 2004.

[3]Although the record does not contain any statement of
reasons for the initial grant of benefits, administrator event
notes from May 26, 1999 - the day after Plaintiff filed his claim
- indicate that the claimant's diagnosis was both "has rod in leg
for femur" and "major depression."  (Vol. I p. 57).

Aetna required periodic "Managed Disability Statements" from both Dr. Katz and Dr. Tessler in addition to preexisting medical records.  In a report dated June 6, Dr. Katz had reported that Plaintiff was experiencing "significant pain" due to his pre-existing condition, and that a return-to-work date was unknown. (Vol. I p. 271).  Dr. Katz's treatment notes from this time indicate that, although the fracture had healed, the "long periods of ambulation and sitting" required by Plaintiff's job had aggravated symptoms of pain and discomfort in the left hip. (Vol. II p. 084).

Dr. Tessler also submitted managed disability statements, on July 27 and September 22, 1999.  In both reports he diagnosed Plaintiff with Major depressive disorder, recurrent episodes, and indicated that symptoms disabling him from his job included depressed mood, impaired concentration, and decreased energy and drive.  (Vol. I pp. 262-63).  Based on the reports of Dr. Katz and Dr. Tessler, Aetna periodically recertified Plaintiff's period of disability.

In November, 1999, Plaintiff was approved by Aetna for, and began receiving, long-term disability (LTD) benefits, again subject to periodic recertification based on updates of the claimant's condition.  The December 3, 1999 letter informing Plaintiff of the approval did not indicate the medical basis for

awarding benefits.  It did, however, indicate that claimants must be eligible on a month-to-month basis to receive benefits.  (Vol. I p. 397).  The letter also noted that if the disability was "the result of a mental condition," benefits would be limited to twenty-four months from the start of benefit payments.  (*Id.*)  Furthermore, it informed Plaintiff that if he was still eligible for LTD benefits on May 25, 2001, he would have to satisfy an "any occupation" definition of disability.[4]  (*Id.*)

Both Dr. Katz and Dr. Tessler continued to treat the Plaintiff and report to Aetna accordingly.  Dr. Katz's treatment notes continued to indicate that Plaintiff complained of pain and stiffness in the left hip, and tenderness due to the prominence of the stabilizing rod in his leg.  (Vol. I p. 265).  He also continually noted Plaintiff's difficulty with ambulation and persistent tenderness or discomfort due to the prominence of the stabilizing rod in the leg.  (*Id.*)  In notes dated April 26, 2000, Dr. Katz also indicated that Plaintiff had complaints of difficulty with stair climbing and feelings of being "off balance."  (*Id.*)

Plaintiff also continued his therapy with Dr. Tessler on a regular basis, even while away for several months in California

---

[4]As the SPD explains, this means that in order to be deemed "totally disabled" under the Plan, the claimant must be "unable to engage in 'any gainful occupation'" for which the claimant is, "or may reasonably become, qualified by education, training or experience."  (SPD p. 3.6)

in early 2000.  In a note to Aetna on March 13, 2000, Dr. Tessler indicated that Plaintiff continued to describe unstable moods in their phone sessions, and that his diagnosis for Plaintiff was Bipolar Disorder.  (Vol. I p. 254).  He also explained that Plaintiff "clearly has not yet had a significant period of mood stability."  (*Id.*).

In June 2000, Aetna arranged for Plaintiff to undergo a psychological evaluation with Dr. Donald Hiebel, a psychologist, and an Independent Medical Examination (IME) with Dr. Jerome Schnitt, a psychiatrist.[5]  On June 6, 2000, Plaintiff was evaluated by Dr. Hiebel, who administered a number of tests and talked to Dr. Tessler about his clinical diagnosis and prognosis. In his report, Dr. Hiebel concluded that Plaintiff was "clearly suffering from a depressive episode," seemingly Bipolar I Disorder, compounded by "debilitating anxiety."  (Vol. I p. 249). He also determined that Plaintiff's depression was too severe to allow him to return to work in his former capacity, notably because "his mind was his most useful and valuable tool," and this tool was "broken."  (Vol. I p. 249).  He added, however, that Plaintiff was "probably" capable of some kind of work, though he would likely not command anywhere near his previous income.  (*Id.*).

---

[5]These doctors were selected and contacted by Unival, an independent medical services contractor.

On June 19, 2000, the IME was performed by Dr. Schnitt, who had met with Plaintiff a few days prior.  Dr. Schnitt's evaluation was based on that meeting and Dr. Hiebel's evaluation. In his report, Dr. Schnitt confirmed that Plaintiff suffered from Bipolar Disorder, which "severely debilitated him."  (Vol. I p. 276).  Dr. Schnitt reported that, among other limitations, Plaintiff was "too dysphoric and irritable to be with others" and suffered from poor concentration, recall, and organization. (*Id.*)  He also noted that Plaintiff had lost the cognitive skills he had previously needed, and concluded that he "cannot work at any level, in any capacity."  (*Id.*)

Based on the reports of Dr. Katz and Dr. Tessler, as well as the evaluations by Dr. Hiebel and Dr. Schnitt, Aetna continued to recertify Plaintiff's LTD benefits on a periodic basis.  However, by letter dated May 29, 2001, Aetna informed Plaintiff that as of May 26, 2001 - twenty-four months after he began receiving benefits - his disability benefits had been terminated. (Stipulated Facts Ex. B).  The letter indicated that the 24-month limitation on benefits for a disability resulting from a "mental/nervous condition" applied to Plaintiff's claim.  (*Id.*) Aetna also explained that Plaintiff was entitled to a review of the decision, and that it would consider any relevant documents Plaintiff wished to submit.  (*Id.*)

7

*First Appeal*

On July 16, 2001, Plaintiff's attorney requested a review of Aetna's decision, arguing that Plaintiff's disability did not "arise from or on account of" a mental condition under the terms of the Plan, (Vol. I p. 432) and submitted additional information for Aetna's consideration (Vol. I pp. 372-413).  Aetna's medical consultant, Dr. Oyebode Taiwo, reviewed the information in Plaintiff's file, including the reports by Dr. Katz, Dr. Tessler, Dr. Hiebel, and Dr. Schnitt, and the documents recently submitted by Plaintiff.  (Vol. I p. 354).  After summarizing both his physical and mental conditions, Dr. Taiwo concluded that the "primary health problem preventing [Plaintiff] from gainful employment is his psychiatric condition," and that given his physical limitations, Plaintiff "should be physically capable of performing sedentary work."  (Vol. I p. 246).  By letter dated November 1, 2001, Aetna informed Plaintiff that, based on a review of his file and Dr. Taiwo's evaluation, it was upholding its termination decision.  (Vol. II p. 042).

*Second Appeal*

In a letter dated May 23, 2003, Plaintiff's attorney requested another review of Aetna's decision by Equitable's Benefits Appeals Committee (BAC), its internal appeals board. (Vol. II p. 119).  Plaintiff argued that the language in the SPD

8

regarding the mental condition limitation should apply instead of that in the Managed Disability Plan, because he had never received the latter document. (*Id.*).  He then contended that the disability did not "arise from or on account of" a mental condition, and that Aetna improperly characterized it as such to justify termination of benefits. (*Id.*).

On July 11, 2003, the BAC met to discuss Plaintiff's appeal and determined that, while it had sufficient information regarding his psychiatric disability, it needed more information regarding his physical condition. (Vol. II p. 139).  As a result, the BAC requested all documents related to Plaintiff's application for Social Security disability benefits, as well as all of Dr. Katz's treatment notes. (*Id.*).  The Committee also requested that Aetna arrange an orthopedic IME for Plaintiff to aid its decision-making process. (*Id.*).

On October 27, 2003, an orthopedic IME was conducted by Dr. Robert Geist.  Based on his examination of Plaintiff and a review of Dr. Katz's office notes, Dr. Geist submitted his evaluation and a completed Functional Capacity Worksheet. (Vol. II pp. 006-011).  In his report, Dr. Geist noted that Plaintiff had pain in the hip and groin area with rotation of the hip, but that there was no rotational deformity and he had full range of motion in the knee, foot and ankle. (Vol. II p. 007).  Along with a fracture of the left femur and "painful hardware" in the left

9

leg, Dr. Geist included Plaintiff's history of depression in his diagnosis, but stated that it was outside the scope of his practice to evaluate behavioral or psychiatric diagnoses.  (Vol. II p. 008).  He concluded that Plaintiff's "medical diagnosis is poor," that he is unlikely to resume his previous work, and that Plaintiff "would be eligible, at most, for part-time sedentary work."  (*Id.*).  He then added that, should he return to work, Plaintiff would require a job that would allow "alternate sitting and standing every half hour" and an environmentally-controlled room.  (*Id.*).  In the attached Employability and Impairment Summary Form, Dr. Geist's "prognosis for some type of employment" was indicated as being "pending removal of femoral rod."  (Vol. II p. 010).

Dr. Geist also completed a Functional Capacity Worksheet. On that form he indicated that Plaintiff could perform sitting, standing, and walking only occasionally (33% of the day), but could perform other motions such as hand grasping, manipulation, and repetitive motion frequently (34-66% of the day).  (Vol. II p. 011).  He also indicated that Plaintiff was capable of working two hours per day.  (*Id.*).

By letter dated April 26, 2004, the BAC informed Plaintiff that it had denied his appeal and upheld Aetna's initial decision to terminate benefits.  (Vol. II p. 002).  The Committee indicated that it had considered all of the information in

10

Aetna's files, as well as the additional information submitted by
Plaintiff's attorney and Dr. Geist.  It then explained that
Plaintiff was originally disabled due to a mental condition, and
thus could not receive benefits beyond twenty-four months.  (Vol.
II p. 004).  Based on an assessment of his physical condition,
the BAC concluded that after that period Plaintiff was capable of
performing a sedentary occupation, and thus was not physically
disabled under the "any occupation" definition.  (*Id.*)  The
Committee's letter appeared to base this decision primarily on
Dr. Geist's report, which it read as stating that Plaintiff would
be able to work under certain circumstances.  (*Id.*).

Plaintiff filed this suit on July 9, 2004, alleging that
Defendants had wrongfully denied him benefits in violation of the
terms of the Plan, and that they breached a fiduciary duty to
him.  The parties filed cross motions for summary judgment, which
were denied.  They then submitted a joint statement of stipulated
facts, and agreed that the Court, sitting without a jury, shall
resolve all disputed issues of fact and legal issues raised, in
consideration of the administrative record and the briefs
submitted by the parties to this point.

<u>DISCUSSION</u>

*ERISA Standard of Review*

The Plaintiff brings his claim for wrongful denial of

11

benefits under 29 U.S.C. § 1132(a)(1)(B) of the Employee
Retirement Income Security Act of 1974 (ERISA), which provides a
federal cause of action for suits "to recover benefits due to [a
beneficiary] under the terms of his plan, to enforce his rights
under the terms of the plan, or to clarify his rights to future
benefits under the terms of the plan."  A denial of benefits
challenged under 29 U.S.C. § 1132(a), such as the one challenged
by Plaintiff here, is reviewed *de novo*, "unless the benefit plan
gives the administrator or fiduciary discretionary authority to
determine eligibility for benefits or to construe the terms of
the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,
115 (1989).  If the plan administrator has such discretionary
authority, a court will defer to his decision, unless it was
"without reason, unsupported by substantial evidence, or
erroneous as a matter of law."  *Pinto v. Reliance Standard Life
Ins. Co.*, 214 F.3d 377, 393 (3d Cir. 2000).  Under this
"arbitrary and capricious" standard, "a plan administrator's
decision will be overturned only if it is clearly not supported
by the evidence in the record or the administrator has failed to
comply with the procedures required by the plan."  *Stratton v.
E.I. Dupont DeNemours*, 363 F.3d 250, 256 (3d Cir. 2004) (quoting
*Orvosh v. Program of Group Ins. For Salaried Employees of
Volkswagen of Am., Inc.*, 222 F.3d 123, 129 (3d Cir. 2000)).
"This scope of review is narrow, and the court is not free to

substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits." *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997).  In conducting its review of the administrator's decision, a court must look to the "record as a whole," which "consists of that evidence that was before the administrator when he made the decision being reviewed." *Id.*

The disability plan in question here clearly granted Defendant authority to interpret the terms of the plan and make determinations of eligibility for benefits thereunder, and the Plaintiff has not argued that a *de novo* standard should be applied.[6]  The arbitrary and capricious standard thus applies, and this court must give deference to the decision of the plan administrator.

However, in situations where "a benefit plan gives discretion to an administrator or fiduciary who is operating

---

[6]The Summary Plan Description distributed to the Plaintiff at the beginning of his employment with Defendant states:

> The [Short-Term and Long-Term Disability] Plans will be administered – and all benefits authorized – by the Plan Administrator or its agent.  The Plan Administrator, or a designated party, has the discretionary authority to determine eligibility for benefits under these Plans.  This discretionary authority includes the right to make all determinations about the right of any person to receive benefits under the Plan and to interpret the terms of the Plans.

Plaintiff's Complaint, Ex. A, p. 3.1

13

under a conflict of interest, that conflict must be weighed as a
factor in determining whether there is an abuse of discretion."
*Firestone*, 489 U.S. at 115.  The Third Circuit has indicated
that, where such a conflict exists, a "sliding scale" method is
used to adjust the arbitrary and capricious standard, which
"grants the administrator deference in accordance with the level
of conflict."  *Post v. Hartford Ins. Co.*, No. 05-4927, 2007 WL
2669825, at *4 (3d Cir. Sept. 13, 2007).  In determining whether
this heightened standard should apply, courts consider both
structural and procedural factors, any of which can provide the
basis for closer review.  *Id.*  First, the structural inquiry
looks into "whether the plan is set up so that the administrator
has strong financial incentives routinely to deny claims in close
cases."  *Id.* at *6.  This is not a "mechanistic test," but should
focus on "whether the structure of the plan raises concerns about
the administrator's financial incentive to deny coverage
improperly.  *Id.*  Second, courts may examine the administrator's
actual decision-making "to determine whether there is evidence of
bias" against the claimant, which would give the court "reason to
doubt [the administrator's] fiduciary neutrality."  *Id.*  If
procedural irregularities in a particular case raise suspicion of
bias, they may call for more penetrating review of the decision.
*Id.*  The burden of proof is on the claimant to show that the
circumstances call for a heightened standard of review.  *See*

14

*Kotrosits v. GATX Corp. Non-Contributory Pension Plan for
Salaried Employees*, 970 F.2d 1165, 1174 (3d Cir. 2003)("Where the
sponsor of a plan reserves for the Plan Administrators the
discretion to interpret the plan, anyone urging that the court
disregard that reservation has the burden of showing some reason
to believe the exercise of discretion has been tainted.");
*Schlegel v. Life Ins. Co. of N. America*, 269 F. Supp. 2d 612, 617
(E.D.Pa. 2003).

       We conclude that the structural and procedural circumstances
present in this case do not call for a heightened form of
arbitrary and capricious review.  First, the plan is not
structured in a way that "gives it financial incentives to act
against the participants' interest."  *Id.* at *5.  While Aetna
administers the plan and makes initial determinations of
eligibility for benefits, it draws benefit payments from an
independent trust that is funded by the employer (Vol. I p.8) and
can only be used for the benefit of plan participants or plan
expenses.  In fact, Defendant makes use of a plan very similar to
the one considered in *Stratton*, which noted that using outside,
independent claims administrators to hear initial claims
"provides the safeguard of neutral evaluation."  *Stratton*, 363
F.3d at 255.  Here, though, benefit payments are not funded by
the employer on a "case-by-case" basis thus the financial
incentive to deny claims is virtually eliminated because "each

15

dollar avoided" by denying benefits is not necessarily "a dollar that accrues" to AXA. *See id.* at 254-55 (holding that only a "slightly heightened" standard would be used for a plan which allowed for independent claims evaluation by an outside insurer, but which was funded on a case-by-case basis). In fact, the Third Circuit has found that a plan structured like the one here do not present a conflict that would raise the court's suspicion. *See Abnathya v. Hoffmann-LaRoche, Inc.*, 2 F.3d 40, 45 n. 5 (3d Cir. 1993). On the whole, then, the structure of the plan here does not indicate any conflict that would call for closer scrutiny of the plan administrator's decision.

Neither is there sufficient evidence of procedural bias in Aetna's decision-making here to give the court reason to doubt its fiduciary neutrality. Plaintiff has made several allegations of bias and various "procedural irregularities" that could support an inference of self-interest leading to heightened review. These assertions, however, do not identify any kind of inconsistencies in the administration of the plan that have been identified in this circuit as indicative of bias towards the claimant.[7]

---

[7]For example, the Third Circuit has noted that heightened review may be called for when the following irregularities were present: (1) Reversal of position without additional medical evidence; (2) self-serving use of physician reports; (3) ignoring recommendations from staff that benefits be awarded; and (4) requesting an examination of the claimant even though all existing evidence indicates disability. *See Post*, 2007 WL

Specifically, Plaintiff alleges that, after the initial denial of benefits effective May 26, 2001, he was not provided with all "pertinent documents" used in the decision and was not allowed to submit any new evidence to support his case on appeal. These failures, he asserts, constitute evidence of bias on the part of the Defendant.  Plaintiff does not explain, however, how this demonstrates why Aetna had an improper motivation to deny his claim or some other self-interested conflict that would raise the court's suspicion.  Furthermore, as we describe more fully in addressing his claim of breach of fiduciary duty, Plaintiff actually took advantage of a fairly robust opportunity to submit new evidence on appeal.

Plaintiff also alleges that the claims investigator assigned to his claim, Charlene Archambault, exhibited "hostility" and "prejudice" that tainted Aetna's decision to terminate benefits after 24 months.  He points to the language of several internal emails as evidence of this bias, as well as the fact that the claims investigator made a Disability SIU (Special Investigation Unit) Request without any prior evidence of fraud.  In sum, Plaintiff's assertions amount to an accusation that the claims investigator's personal prejudice led her to try to find evidence to deny his claim.

---

2669825, at *7 (surveying Third Circuit case law on the issue of ERISA standard of review).

It is true that closer scrutiny may be required where "the impartiality of the administrator is called into question" by evidence of bad faith. *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 435 (3d Cir. 2001). Here, though, Ms. Archambault's actions are not so outside the realm of ordinary disability claims administration that the court should be suspicious of bad faith. The claims investigators notes referring to the psychological basis for Michaels's claim are certainly consistent with the normal administration of his claim, since different provisions of the plan apply depending on the basis for disability.[8] Furthermore, investigating the validity of Plaintiff's asserted disability is not an uncommon part of claims administration. Continued investigation after confirming the claimant's status as disabled would potentially raise suspicion, *see Post*, 2007 WL 2669825, at *10; however, there is no evidence in the record that Aetna did so after Michaels was surveilled for two days and even after the SIU was ordered, Michaels's disability was recertified several more times.

Finally, Plaintiff maintains that Equitable "ignored" certain medical evidence that supported his claim and "distorted"

---

[8]Ms. Archambault also did not spontaneously "recharacterize" the disability as psychologically-based, as Plaintiff suggests. In fact, the event notes in the record show that Plaintiff's period of disability was recertified at least once (on March 14, 2000) on the basis of his psychological restrictions *before* Ms. Archambault even took over Michaels's claim. (Vol. II p. 313)

the record to support its decision.  He cites *Holzschuh v. UNUM Life Ins. Co. of America*, No. 02-1035, 2002 WL 1609983, at *6 (E.D.Pa. July 18, 2002) and *Doyle v. Nationwide Ins. Co.*, 240 F. Supp. 2d 328 (E.D. Pa. 2002) in claiming that these actions warrant heightened scrutiny.  This argument, though, again fails to point to specific evidence of a procedural irregularity that would give this court pause in deferring to the administrators. There is no evidence in the record supporting his claim that certain evidence (namely, the reports of Dr. Katz and Dr. Geist) was completely ignored, and in fact the record contradicts that assertion, as we discuss in greater depth below (discussion of weight accorded to treating physicians, *infra*).

*Holzschuh* and *Doyle* presented different factual situations, and are distinguishable on this point.  The court in those cases found reason to be skeptical where the administrator made statements about the claimant's condition that were *directly* contradicted by the medical evidence.  In *Doyle*, the court heightened its scrutiny very slightly because the administrator ignored a treating physician's "consistent contrary conclusion" in more than one report that the claimant was unable to return to work.  *Doyle*, 240 F. Supp. 2d at 342.  And in *Holzschuh*, the court found evidence of bias where the administrator used non-examining physicians' reports to find that there was no "objective" evidence of a disabling physical condition, even

19

though the record was rife with MRI, CT, and x-ray evidence. *Holzschuh*, 2002 WL 1609983 at *6-7.  Here, though, Aetna did not make any such findings that were directly contradicted.  Dr. Katz's Managed Disability reports, office notes, and progress statements are vague about Plaintiff's ability to work.  Indeed, in those forms, Dr. Katz only indicated that Plaintiff's return to work was "to be determined" or "unknown."[9]  (Vol. I pp. 266-67, 271).  Furthermore, unlike the physician reports in *Doyle*, Dr. Katz's letter in support of Plaintiff's claim also does not express a clear opinion on the issue of whether Plaintiff can engage in *any* occupation.[10]  (Vol. I p. 149).

Unlike the records from Dr. Katz, the report from Dr. Geist does directly address Plaintiff's ability to work in any occupation.  We do not agree with Plaintiff, however, that the Equitable BAC "distorted" its conclusions to serve its decision to terminate benefits.  Dr. Geist concluded that Plaintiff would be unable to resume his previous work, but that he would "be eligible, at most, for part-time sedentary work."  (Vol. II p.

---

[9]The fact that Plaintiff's status was "to be determined" seems to be largely due to an indication in the record that he was scheduled at several points to have the femoral rod removed. However, the surgery to remove the rod was never performed.

[10]Dr. Katz noted that Plaintiff's ability to function in *his* job had decreased, and seemed to only address Plaintiff's actual experiences when he tried to return to work after his leg injury. He mentions that Plaintiff continues to have problems with his hip, but does not express an opinion on his ability to work.

008).  He reiterated that opinion at the end of his report. (Vol.
II p. 009).  As Plaintiff accurately points out, Dr. Geist also
indicated that certain conditions would have to apply to a return
to work, such as limiting periods of sitting and a controlled
climate.  (*Id.*)  He did not, however, make contrary statements
that Plaintiff was unable to work *at all*, and we do not see
evidence of bias in the BAC's reading of the report in line with
his clearly-stated conclusions.[11]

In sum, the record does not provide sufficient evidence to
give this court reason to doubt the neutrality of the claims
administrator, who had no structural conflict of interest and
administered the claim consistent with the terms of the plan.
Accordingly, ordinary arbitrary and capricious review will be
applied here.  The decision to deny Plaintiff benefits will only
be set aside if it was "without reason, unsupported by
substantial evidence, or erroneous as a matter of law."  *Pinto*,
214 F.3d at 393.

*ANALYSIS*

**Count I.  Denial of Benefits**

**A.  Termination of Benefits at the End of Twenty-four Months**

1.  *Applicable Plan Terms*

---

[11]We discuss Dr. Geist's report and its support for the BAC's
decision more fully in Section I.B, *infra*.

As an initial matter, Plaintiff has disputed which plan
actually governs his claim, pointing to the fact that the 1988
Plan established by Equitable, was the only one initially
provided when he requested a copy of the plan.  The record seems
to show that pursuant to the administrative services agreement
between Equitable and Aetna, a new Managed Disability Plan (MDP)
was adopted and scheduled to go into effect on January 1, 1995.
(Vol. I p. 16).  Unlike the "arises from or on account of"
language in the SDP, the MDP states that a period of disability
will end after twenty-four months if Aetna determines the
disability "is, at any time caused to any extent by a mental
condition" described in the DSM.  (Vol. I p. 30).

Plaintiff has not offered any evidence supporting his
implication that the MDP was not formally adopted, nor is there
such evidence in the record.  The adoption of the MDP is clearly
contemplated by the 1988 Plan, which explicitly calls for the
Plan Administrator to adopt its own rules and procedures to aid
in administering the Plan.  (1988 Plan, Plaintiff's Complaint Ex.
A, § 6.6).  In its letters to Plaintiff regarding both the award
and termination of LTD benefits, Aetna also appeared to be using
the language in the MDP.  That said, Plaintiff acknowledged that
he only received the SPD when he became employed with Equitable,
and Defendants have not claimed otherwise.  The court then can
only assume that this was the document on which he relied in

22

determining his benefits.  Thus, to the extent that it differs from the MDP, we find that the language describing the 24-month provision in the SDP should govern our review of whether the Plan Administrator erred in finding that the provision applied to Plaintiff's claim for benefits.  *See Brennan v. Greenwood Trust Co.*, 1999 WL 33220028, at *4 (D.Del. February 9, 1999)(relying on the language in the SDP, rather than the underlying plan, where the SDP was the only document received by the claimant).  This does not change, however, the "arbitrary and capricious" standard of review; we still give deference to the Administrator's interpretation of the "mental condition" limitation.  And as we explain below, even under the more restrictive language of the SDP, the decision to terminate benefits based on this provision was not arbitrary and capricious.

2.  *Effect of Plaintiff's Mental Condition*

The Summary Plan Description (SPD) provided by Equitable to Plaintiff specifies:

> "[A] period of total disability will end after 24 months of receiving disability benefits if it is determined that the disability arises from or on account of . . . a mental condition described in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders, published by the American

23

Psychological Association."
(SPD p. 3.6).  As we have already noted, the Plan gives the administrator "the right to make all determinations about the right of any person to receive benefits under the Plan and to interpret the terms of the Plans."  (SPD p. 3.1).  The Plan administrators were therefore authorized to determine whether Plaintiff's disability "[arose] from or on account of" a mental condition, and to decide whether the 24-month limitation applied on that basis.

Because there is substantial evidence in the record to support Aetna's determination that Plaintiff's disability stemmed from his mental limitations, we find that that determination was not arbitrary and capricious.  Aetna and the Equitable BAC were faced with an abundance of medical evidence from both Plaintiff's treating psychiatrist and outside experts that could support the inference that mental illness was his primary disabling condition.  The record includes numerous Managed Disability Statement reports from Dr. Tessler diagnosing Plaintiff with Bipolar I Disorder and major depression, and listing as "disabling" symptoms[12] such signs as depressed mood, difficulty concentrating, and impaired organizational abilities.  (Vol. I

---

[12]The forms given to Dr. Tessler by Aetna asked him to list either "Patient's current signs/symptoms (functional limitations) which disable from his job" or "Symptoms keeping employee out of work."

pp. 262-64, 268, 170).  A July 12, 2001 letter from Dr. Tessler summarizing Plaintiff's condition indicates that his ability to concentrate and to think quickly with facility is impaired, and he was "unable to sustain the energy, drive or concentration necessary to work effectively and consistently" at any job. (Vol. I p. 389).  That letter also appears to attribute Plaintiff's failure to work at Equitable in early 1999 to "high energy states, lack of sleep, grandiose behavior at seminars, racing thoughts, and anxiety," which led to a diagnosis of Bipolar I Disorder.  (*Id.*).

The reports from Dr. Hiebel, Dr. Schnitt, and Dr. Taiwo also support a finding that Plaintiff's disability arose from his psychological condition.  Dr. Hiebel noted that Plaintiff's mind was his "most useful tool" and that, because of his depression, this tool was "broken" and prevented him from returning to work. (Vol. I p. 249).  Dr. Schnitt's report also opined that Plaintiff's "skills are cognitive" and were no longer available to him.  (Vol. I p. 276).  Dr. Schnitt concluded that Plaintiff was "severely debilitated" by his Bipolar Disorder and did not respond to antidepressants and mood stabilizers.  (*Id.*).  He also noted that Plaintiff was "too dysphoric and irritable to be with others" and "too humiliated/disorganized to accept/provide supervision," and had poor concentration and memory.  (*Id.*). Finally, Dr. Taiwo's report after Plaintiff's first appeal

provides further evidence to support Aetna's decision.  After considering all the relevant medical information - both psychiatric and orthopedic - he concluded that "the primary health problem preventing [Plaintiff] from gainful employment is his psychiatric condition."  (Vol. I p. 246).

All of these findings together could lead a reasonable person to conclude that Plaintiff's mental illness on its own prevented him from working due to disability.  To be sure, the record also contains evidence regarding the impact of Plaintiff's *physical* limitations, specifically the reports of Dr. Katz and Dr. Geist.  However, we "may not substitute [our] own judgment for that of plan administrators" under the arbitrary and capricious standard, *Stratton*, 363 F.3d at 256, and need only find that there was substantial evidence to support the administrator's decision here.  Because such evidence exists to support a finding that Plaintiff's disability "arose from" or on account of his mental condition, Aetna's decision to apply the 24-month limitation was not arbitrary and capricious.[13]

_____

[13]The record shows that Plaintiff's mental condition actually *did* provide the basis for the majority of Aetna's periodic approvals of recertification.  This began early in Plaintiff's period of disability, when he began receiving STD benefits, and was consistent until the end of the 24-month period. Administrator event notes do indicate that two periods of recertification - on June 3 and July 22, 1999 - were based on previously submitted information from Dr. Katz.  But the remaining certifications of STD benefits appear to have been based on the symptoms of Plaintiff's mental illness, as confirmed by Dr. Tessler's reports.  On August 16, 1999, the administrator

Plaintiff makes several arguments in contending that Aetna should not have terminated his benefits after twenty-four months under the "mental condition" limitation.

First, Plaintiff argues that he was not told that his disability was classified as "mental," and that this is evidence of Aetna's attempt to recharacterize his disability as such to cut off benefits towards the end of the 24-month period. However, though Aetna was not explicit in explaining the particular reasons for its grant of LTD benefits, Plaintiff must have been aware that his psychological condition provided some basis for the certification of his period of total disability. Aetna included in its letter granting LTD benefits the language of the 24-month limitation and indicated that it may apply to him.  The record shows that Plaintiff was also well aware that Dr. Tessler, his psychiatrist, was submitting completed Managed Disability statements regularly based on his observations in their sessions.  Furthermore, event notes from various points over the two-year period show that Aetna administrators often had

event notes indicate Plaintiff was recertified for thirty-eight days "per [employee's] inability to perform job functions due to . . . depression, difficulty concentrating, diminished organization, decreased energy." (Vol. II p. 319).  Aetna then recertified Plaintiff for another seventy-seven days - after Plaintiff had requested an extended certification - based on "[the employee's] inability to perform job functions due to impaired concentration[,] decreased drive and energy[, and] depressed mood." (*Id.*)  Thus, Plaintiff's allegation that Aetna "recharacterized" his disability as psychological at the end of the 24-month period is not supported in the record.

Plaintiff's help in getting those forms to Dr. Tessler.  (see
Vol. II pp. 295, 312, 320).  Those notes also indicate that
Plaintiff informed Aetna that he had left work two years earlier
"with depression problems."  (Vol. II p. 320) Plaintiff's claim
that he believed his disability to be based solely on physical
impairments is thus contradicted by the record, and does not
affect our evaluation of the evidence supporting Aetna's decision
to terminate benefits.

Second, Plaintiff also contends that the 24-month limitation
in the Plan should not have been applied to his period of
disability because the "precipitating cause" of his disabling
mental condition was a physical injury.  The Third Circuit has
not directly addressed this issue,[14] but many other courts have

---

[14]Plaintiff suggests that the Third Circuit decided this
issue in his favor in *Lemaire v. Hartford Life and Accident Ins.
Co.*, 69 Fed. Appx. 88 (3d Cir. 2003), which upheld an award of
summary judgment for a claimant who asserted that a similar 24-
month "mental/nervous" limitation should not have applied because
his depression was secondary to his Hepatitis C and Chronic
Fatigue Syndrome.  The District Court had ruled that there was
not substantial evidence to support the defendant's conclusion
that depression was the claimant's primary disabling condition.
In its nonprecedential opinion, however, the Third Circuit
explained that the District Court's grant of summary judgment
"rested upon its finding that Hartford's determination that the
evidence of depression was 'objective' and that the evidence of
physical disability was 'not objective' lacked both logic and
support in the record."  *Id.* at 92.  The court, applying a
heightened standard of review, held only that it was arbitrary
and capricious to require "'objective' medical evidence to
establish the etiology of chronic fatigue syndrome, which is
defined by the absence of objective medical evidence."  *Id.*  The
Third Circuit thus has not directly ruled on the issue and,
unlike the administrator in *Lemaire*, Aetna and the BAC did not

upheld the application of similar 24-month limitations where the claimant's disability was based on a mental condition that may have had a physical symptom or cause. *See, e.g., Fuller v. J.P. Morgan & Co.,* 423 F.3d 104 (2d Cir. 2005) (upholding application of a 24-month "mental disability" limitation and holding that whether the claimant's disability "arises from" a mental disorder is "a question quite distinct from whether the disorder itself arises from a physical cause"); *Tolson v. Avondale Industries, Inc.,* 141 F.3d 604, 610 (5th Cir. 1998)(upholding application of 24-month limitation to disability based on depression that itself was a product of either pathological disease or the medication used to treat it); *Pelletier v. Fleet Fin. Group,* No. 99-245-B, 2000 WL 1513711, at *4-5 (D.N.H. Sept. 19, 2000)(noting the term "mental illness" is "properly applied to disorders typically identified as 'mental,' irrespective of their causes").  We agree with those courts and find that Aetna and the Equitable BAC did not err in interpreting the terms of the plan to distinguish Plaintiff's mental condition from any "precipitating" physical cause.  Plaintiff's diagnosed bipolar disorder and depression are certainly "mental conditions" described by the American Psychological Association in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV);

---

place a similarly "impossible hurdle" in the way of Plaintiff's proving his physical disability.

that the mental conditions were caused by a physical injury does not change that fact. *See Tolson*, 141 F.3d at 610. Accordingly, the administrator's decision to apply the limitation to Plaintiff's case was within the terms of the plan, and was not arbitrary and capricious.

**B.  Denial of benefits based on "any occupation" determination**

Under the terms of the Plan, after the first 24 months of a certified period of total disability, a beneficiary will continue to be deemed "disabled" only if he is "not able, solely because of disease or injury, to work at any reasonable occupation."[15] Because a period of total disability based on a disability "aris[ing] from or on account of a condition related to . . . a mental condition" cannot extend beyond 24 months, though, Plaintiff would have only been entitled to recertification of the period of disability if he satisfied the "any occupation" definition based solely on his *physical* condition. To aid in this determination, after Plaintiff's second appeal the Equitable BAC ordered an orthopedic Independent Medical Examination, which was conducted on October 27, 2003, by Dr. Robert Geist.

We find that the determination that Plaintiff could engage in "any reasonable occupation," as it is defined in the plan, is

---

[15]The plan document defines "reasonable occupation" as "any gainful activity for which you are, or may reasonably become, fitted by education, training or experience."  (Vol. I p. 41)

not "clearly unsupported" in the record.  Both Dr. Geist's and
Dr. Taiwo's reports conclude that Plaintiff would be able to
engage in at least some sedentary work.  Dr. Taiwo, Aetna's
Consulting Disability Medical Director, examined the medical
evidence in Plaintiff's file, including the reports and office
notes submitted by Dr. Katz.  He concluded that "given Mr.
Michaels' [sic] physical limitations, he should be physically
capable of sedentary work," subject to certain limitations such
as a setting that "would allow him to alter his position
frequently."  (Vol. I p. 246).

Dr. Geist, who actually examined Plaintiff as part of the
IME ordered at the Equitable BAC's request, provided an opinion
consistent with Dr. Taiwo's.  He concluded that Plaintiff "is
capable of performing, at most, short-term sedentary occupation,"
subject to limitations of alternating sitting and standing, and
an environmentally-controlled environment.  (Vol. II p. 009).
When asked by the BAC to clarify the limitations in the report,
Dr. Geist explained that Plaintiff would be able to sit for
thirty to sixty minutes at a time.  (Vol. II p. 012).  He further
clarified that with respect to the "environmental control,"
Plaintiff exhibited cold intolerance but that "[i]f such a room
were available, then certainly a work trial would be reasonable
as long as the restrictions matched the already supplied work
restrictions."  (Vol. II p. 013).

31

Furthermore, the record does not contain the opinions of any medical professionals stating that Plaintiff definitely could *not* engage in "any occupation" in May 2001 and afterwards.  As we have already noted, the reports from Plaintiff's treating physician, Dr. Katz, note his physical impairments but fail to provide any opinions on whether he could engage in "any" work. Thus, given that the evidence in the record from Dr. Katz does not appear to contradict the opinions of Dr. Taiwo and Dr. Geist, we cannot say that the Administrator's decision to terminate benefits was "clearly unsupported" by the record.

Plaintiff makes several arguments in contending that Defendant was arbitrary and capricious in failing to recertify his period of disability based on his readings of Dr. Katz's and Dr. Geist's reports.

First, Plaintiff has suggested that the decision to deny him continuing LTD benefits was arbitrary and capricious because Aetna and the Equitable BAC selectively read or ignored the records from Dr. Katz (his treating physician).  These were not the only sources of medical evidence considered by Aetna and the BAC, however.  Thus, given our deferential standard of review, the real issue raised by Plaintiff's argument is whether it was arbitrary and capricious to accord more weight to the opinions of

nontreating physicians that Plaintiff was able to perform "any reasonable occupation."

The Supreme Court has held that "[p]lan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834. However, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* Furthermore, this court has explicitly held that a Plan Administrator's "reliance on its own retained medical consultant's opinions, as opposed to the claimant's treating physician's opinions," is not arbitrary and capricious. *Brandeburg v. Corning Inc. Pension Plan for Hourly Employees*, No. 04-1314, 2006 WL 2136481, at *2 (E.D.Pa. July 28, 2006), *aff'd* No. 06-3755, WL 2030267 (3d Cir. July 16, 2007); *See also Schlegel*, 269 F. Supp. 2d at 627-28 (noting that reliance only on written opinions of independent experts was not arbitrary and capricious if allowed by the plan).

Here, neither the plan document nor the SPD received by the Plaintiff mandate reliance on the treating physician's opinion or

other discrete sources.  The terms of the plan expressively give the administrator the right to "examine and evaluate" the claimant, and to require him to submit copies of any documents in support of the claim (1995 Plan Document, Vol. I. p. 36; SPD, p. 3.18).  The plan thus contemplates - and authorizes - a broader assessment of the medical evidence, and Aetna and the Equitable BAC were thus entitled to consider all the evidence and give each source the weight it saw fit, provided there was substantial evidence for their decisions.

There is no evidence in the record indicating that either Aetna or the BAC "arbitrarily refused to credit" the reports of Dr. Katz or Dr. Geist.  To the contrary, Dr. Taiwo indicated in his review of Plaintiff's case that he reviewed the information supplied by Dr. Katz about Plaintiff's physical impairments. (Vol. I p. 244-45).  And in the BAC's letter denying Plaintiff's second appeal, the Committee stated that its decision made use of Dr. Geist's IME report.  (Vol. II, p. 004).  In fact, the reports of Dr. Taiwo and Dr. Geist appear to take into account the physical limitations documented in Dr. Katz's reports and notes, but go on to provide what Dr. Katz does not - that is, express an opinion about Plaintiff's ability to do "any" work.  Accordingly, Defendant was not arbitrary and capricious in failing to utilize the reports from Dr. Katz and Dr. Geist to the claimant's advantage.

34

Second, Plaintiff suggests that the plan administrators
failed to properly consider the Social Security Administration's
finding that he was entitled to SSDI benefits.  "The decision of
the SSA may be considered as a factor in evaluating whether a
plan administrator has acted arbitrarily and capriciously in
reviewing a plaintiff's claim."  *Marciniak v. Prudential Fin.
Ins. Co. of Am.*, 184 Fed. Appx. 266, 269 (3d Cir. 2006)(emphasis
added)(citing *Dorsey v. Provident Life & Accident Ins. Co.*, 167
F. Supp. 2d 846, 856 n.11 (E.D. Pa. 2001)).  Indeed, this court
has suggested in the past that an SSA determination *should* be
considered in the final benefits decision.  *See id.*; *Byrd v.
Reliance Standard Life Ins. Co.*, No. 04-2339, 2004 WL 2823228, at
*4 (E.D. Pa. Dec. 7, 2004).  But a Social Security award "does
not in itself indicate that an administrator's decision was
arbitrary and capricious, and a plan administrator is not bound
by the SSA decision."  *McCaughan v. Bayer Corp.*, 2007 WL 906267,
at *8 (W.D. Pa. 2007); *see also Dorsey*, 167 F. Supp. 2d at 856
n.11.

Plaintiff contends, based on *Klimas v. Connecticut Gen'l
Life Ins. Co.*, No. 04-5408, 2005 WL 2994710 (E.D. Pa. Aug. 17,
2005), that the Plan improperly failed to take the SSA's finding
of disability into consideration.  However, the record belies
this assertion.  The record shows that the BAC requested - and

35

Plaintiff provided - documents related to his application for SSDI benefits.  (Vol. II, pp. 125, 162).  In its letter informing Plaintiff of the decision to uphold Aetna's termination of benefits, the BAC indicated that it had considered all of the information submitted to it by the Plaintiff.  (Vol. II, p. 004). Defendant's final decision to uphold the termination of benefits in spite of the evidence of the SSA's decision, particularly in light of the "critical differences between the Social Security disability program and ERISA benefit plans," *Black & Decker*, 538 U.S. at 832, is not arbitrary and capricious.[16]

**Count II.  Breach of Fiduciary Duty**

Plaintiff has also alleged that Defendant AXA breached its fiduciary duty to him.  Specifically, he claims that AXA did not provide notice that its decision would be made using the "any occupation" definition, and did not allow him to submit information "directed to the application of that definition" in his case (Complaint p. 5).

As an initial matter, Plaintiff's assertion that he was not given notice that the "any occupation" definition would be used

---

[16]Perhaps the most important difference for this particular case is that Plaintiff's SSA documents indicate that his application for, and award of, SSDI benefits was based on both physical *and* psychological impairments.  Thus, the SSA's decision to grant benefits would have been of limited use in determining whether Plaintiff's period of disability under the Plan should be continued based on his physical restrictions alone.

is thoroughly contradicted by the record.  The Summary Plan
Description clearly explains that, after the first two years of
the employee's period of disability, "total disability" will be
defined as being "unable to engage in any gainful occupation for
which you are, or may reasonably become, qualified by education,
training or experience . . . ."  (SPD, Complaint Ex. A-1, p.
3.6).  Plaintiff stipulated that he received the SPD containing
this provision when he began employment with AXA Equitable.
(Joint Statement of Stipulated Facts, Para. 10)  Plaintiff also
admits that he was apprised of the "any occupation standard" in
Aetna's December 3, 1999, letter to him granting long-term
disability benefits.  (Plaintiff's MSJ p. 17).  After noting that
the "usual occupation" standard would apply for the first 24
months of benefits, that letter clearly states:  "If you are
still eligible for long term disability benefits on May 25, 2001,
it will be necessary for you to meet a more stringent 'any
occupation' definition of disability."  (Vol. I p. 399).
Plaintiff cannot seriously contend that this did not provide
adequate notice of the changing definition of disability.

     The record also controverts Plaintiff's assertion that he
was not given an opportunity to present new evidence directed at
the "any occupation" definition.  The record shows that after
Plaintiff requested an appeal of the initial termination
decision, Aetna contacted his attorney twice with letters

requesting "any new, relevant information pertaining to Mr. Michaels' physical disability condition."  (Vol. I pp. 430, 431). Plaintiff had three months between these letters sent in August, 2001, and Aetna's decision in November, 2001, to provide such pertinent information.  Furthermore, in response to Plaintiff's second appeal, Equitable's Benefits Appeals Committee sent a letter to Plaintiff's attorney stating that they "would like to obtain additional information concerning [Plaintiff's] orthopedic problem as it relates to his appeal under the [LTD] Plan."  (Vol. II p. 125).

Indeed, it appears that Plaintiff actually *did* submit such information.  The "Appeal File" portion of the record includes over forty pages of medical documents and correspondence under the heading "Info Attorney Submitted," (Vol. I pp. 372-415) as well as documents from his treating physician and application for social security benefits (which only Plaintiff himself could have provided).[17]  Again, the record shows Plaintiff's assertions to be utterly baseless.

However, even if his allegations had support in the record, and even if those allegations could be construed as a misrepresentation constituting breach of fiduciary duty,

---

[17]The minutes of the Equitable BAC meeting regarding Michaels's status also indicate that they received additional information from his attorney on August 5, 2003, August 18, 2003, and September 16, 2003.  (Vol. II p. 017).

Plaintiff would not have a separate remedy for it here.  Count II of Plaintiff's complaint can only be construed as a claim for relief under 29 U.S.C. § 1132(a)(3), which the Supreme Court has interpreted to provide a remedy for individual beneficiaries for breach of fiduciary duty. *See Varity Corp. v. Howe*, 516 U.S. 489 (1996).  In *Varity*, the Supreme Court explained that "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Id.* at 515.  Here, the relief sought by Plaintiff for the alleged breach of fiduciary duty is essentially identical to that sought for his claim of wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B).  Because that provision provides "adequate relief" for Plaintiff's alleged injury of wrongfully-denied benefits, according relief under section 1132(a)(3) would be inappropriate.  *See Ream v. Frey*, 107 F.3d 147, 152 (3d Cir. 1997)("[W]here Congress otherwise has provided for appropriate relief for the injury suffered by the beneficiary, further equitable relief ought not to be provided.")  Accordingly, Plaintiff's claim for breach of fiduciary duty under ERISA must be denied.

CONCLUSION

For the foregoing reasons, Plaintiff's request for relief under ERISA, 29 U.S.C. §§ 1132(a)(1)(B), 1132(a)(2), must be denied.  Accordingly, judgment will be entered in favor of Defendants.  An order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
LAWRENCE MICHAELS              :
                               :
          Plaintiff,           :      CIVIL ACTION
                               :
     vs.                       :      NO. 04-CV-3250
                               :
THE EQUITABLE LIFE ASSURANCE   :
SOCIETY OF THE UNITED STATES   :
EMPLOYEES, MANAGERS, AND AGENTS:
LONG-TERM DISABILITY PLAN      :
          and                  :
AXA FINANCIAL, INC.            :
                               :
          Defendants           :
```

**ORDER**

      AND NOW, this   15th   day of October, 2007, upon consideration of the administrative record, for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that Defendants' denial of Long Term Disability benefits is AFFIRMED and Plaintiff's claim for relief under the Employee Retirement Income Security Act of 1974 is DENIED.


                           BY THE COURT:


                           s/J. Curtis Joyner
                           J. CURTIS JOYNER, J.